**MID–AMERICA TRANSPORTATION COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 14115.**

United States Court of Appeals Seventh Circuit.

Dec. 4, 1963.

V. Lee McMahon, St. Louis, Mo., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin H. Reifin, Attorney, NLRB No. 30, 63–1 CCH NLRB ¶ 12,149, man, General Counsel, Dominick L. Manoli, Associate General Counsel, Elliott Moore, Attorney, N.L.R.B., for respondent.

Before HASTINGS, Chief Judge, and KNOCH and KILEY, Circuit Judges.

KNOCH, Circuit Judge.

This matter comes before us on the petition of Mid-America Transportation Company (hereinafter sometimes called "Mid-America") filed pursuant to § 10(f) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. as amended, to review and set aside a Decision and Order of the National Labor Relations Board entered March 11, 1963, reported at 141 NLRB No. 30, 63–1 CCH NLRB ¶ 12,149, p. 18,920. In its answer, the Board has requested enforcement of its Order.

The Board found that Mid-America refused to bargain in good faith (in violation of § 8(a) (5) and (1) of the Act) by insisting that the bargaining take place only in Tennessee, and by denying the patrolmen of the National Maritime Union of America, AFL–CIO (hereinafter sometimes called the "Union"), the bargaining representative of Mid-America's employees, access to Mid-America's vessel on reasonable terms and conditions.

Mid-America is engaged in transportation of materials by barge on the Mississippi and Ohio Rivers. When the upper Mississippi River is open to navigation (about eight months per year) Mid-America's vessel M/V Eleanor Gordon pushes coal barges from the dock of the Peabody Coal Company in St. Louis, Missouri, to St. Paul, Minnesota, usually returning with grain. During the winter months, M/V Eleanor Gordon pushes barges from Green River and Uniontown, Kentucky, down the Ohio to the Mississippi River, then north to St. Louis, Missouri, and back.

Mid-America is a wholly owned subsidiary of Peabody Coal Company, but maintains a separate "fiscal" office in St. Louis, at which the accounting records are kept and from which Mid-America's employees are paid. Orders for the M/V Eleanor Gordon issue directly from this same office except when the vessel is outside of mobile telephone range. In that case, the vessel twice daily advises a St. Louis dispatcher of her position and the St. Louis dispatcher relays Mid-America's orders by radio.

Mid-America's president, Noble L. Gordon, its dispatcher, Captain W. P. Fouts, and manager of insurance, W. B. Heckman, reside in St. Louis. The manager of insurance operates out of the St. Louis office.

On petition of the Union filed with the Board after its four-year collective bargaining contract with Mid-America, covering all unlicensed employees on its vessel, had expired, the Board held an election February 19, 1962, as a result of which the Union was certified as the representative of all unlicensed employees on Mid-America's Eleanor Gordon.

The Union sought to commence bargaining. Attempts to reach President Gordon in St. Louis elicited a letter from Mid-America's attorneys, located in St. Louis, advising that all labor negotiations were handled by General Manager Thomas Kirkpatrick at the "general offices" in the Union Planters Bank Building, Memphis, Tennessee.

Mid-America is listed in the telephone book and in the Union Planters Bank Building directory as sharing an office with Peabody Coal Company at that address. When the telephone number is called, the operator answers "Peabody Coal Company," not "Mid-America." The Board affirmed the finding of the Trial Examiner that although Mid-America is a Tennessee corporation, its principal office was in St. Louis, Missouri, where its separate office was twice the size of the combined offices it shared with Peabody in Memphis.

The Board found that the Eleanor Gordon (which is the only boat Mid-America owns, although it also owns some 50 to 100 barges which the Eleanor Gordon tows at various times) never actually docked at Memphis. About five times during the three years prior to the Board hearing (but at no time during the year preceding the hearing) the Eleanor Gordon went past Memphis on her way south to Louisiana when she replaced another vessel which was under repair. At times individual members of the crew were changed at Memphis by having a small tug come out to her. Mid-America protests these findings of fact on the ground that they are based on the testimony of a crewman who was not continuously present, as crew members are given a great deal of time off. However, it does not appear that this evidence was controverted.

In the course of correspondence over a period of about two months, the Union tried to set up a bargaining meeting in St. Louis, Missouri, or in Paducah, Kentucky, the site of the Board election and of Mr. Kirkpatrick's home. The Union was advised that Mid-America would not meet in either place, that it transacted no business in Kentucky, and insisted on meetings in Tennessee only.

About a month prior to the Board hearing (in October, 1962) Mid-America changed the home port for the Eleanor Gordon (and her barges) from Wilmington, Delaware, to Memphis, Tennessee. The home port appears with the name on the vessel itself and on the barges.

Meanwhile, the Union's patrolmen, who previously had access to the Eleanor Gordon, were denied permission to board her when they sought to discuss Union matters with employees. General Manager Kirkpatrick replied to Union complaints that any Union representative wishing to board the vessel must obtain a pass signed by Mr. Kirkpatrick, which would be issued for no more than two patrolmen, to be named in advance, and which would allow visits only while the vessel was stationary in port, and only if the Union provided an insurance policy in the amounts of $300,000/$500,000 for injury to the patrolmen and an indemnity agreement for personal injury or property damage caused by the patrolmen.

In the prior four-year contract period, Mid-America had accepted the $25,000/$50,000 personal injury policy which was found by the Board to be standard in the industry, and had demanded no indemnity agreement. No claims were ever made with respect to the Union patrolmen, but near the end of the period, Mid-America notified the Union that a new policy of $100,000/$300,000 would be required.

Mid-America sets out the contested issues as follows:

1. Does the substantial evidence on the record considered as a whole support the Trial Examiner's finding and conclusion, which were adopted by the Board, that the Respondent [Mid-America] refused to bargain with the Union and thus engaged in an unfair labor practice in violation of Section 8(a) (5) of the Act?

2. Does the substantial evidence on the record considered as a whole

support the Trial Examiner's finding and conclusion, which were adopted by the Board, that the Respondent [Mid-America] refused Union patrolmen access to Respondent's vessel and thus engaged in an unfair labor practice in violation of Section 8(a) (5) of the Act?

3. Whether the Trial Examiner's findings of fact and conclusions of law, as adopted by the Board, are contrary to fact and law and for that reason should be set aside.

Mid-America argues that the test of good faith in bargaining must depend in part on how a reasonable man might be expected to react and that in considering the place of bargaining sessions, the test is what is reasonable under all the circumstances.

Granted that St. Louis, Missouri, was most convenient for the Union, Mid-America points out (as did General Manager Kirkpatrick in his correspondence with the Union):

"[R]easons why the meetings should be held in Memphis: (1) that normally bargaining negotiations should take place where the plant is located and where the controversy exists, but since the operation of a towboat is a mobile operation, the location should be a convenient one; (2) that the Respondent is a Tennessee corporation with its principal office in Memphis; (3) that Kirkpatrick as general manager is in charge of operations and labor relations including bargaining, and at all times has to be available to the employees and operations of the Company; (4) that Kirkpatrick is not located in St. Louis, and it would be extremely inconvenient for him to have to bargain in St. Louis; and (5) that Memphis is not only near the center of the Company's operations, but most of the employees reside in the Tennessee-Kentucky area."

Mid-America contends that its position throughout was entirely reasonable and no more adamant than that of the Union.

As to the limitations on the places for visiting the vessel and insurance coverage therefor, Mid-America asserts that these conditions were imposed on the basis of advice from Mid-America's insurance underwriter set forth in a letter which was an exhibit at the Board hearing.

The Board found that Mid-America by insisting that negotiations be held only in the State of Tennessee, and by denying authorized Union patrolmen the right of access under reasonable conditions, was refusing to bargain in good faith with the Union and thus violating § 8(a) (5) and (1) of the Act. The Board therefore ordered Mid-America, on request, to bargain in good faith with the Union at St. Louis, or at any other reasonable location; on request, to grant the right of access to the Eleanor Gordon to authorized Union patrolmen under reasonable terms and conditions, for the purpose of conferring with employees in the unit; and to post the customary notices.

Our study of this case leads us to conclude that substantial evidence on the record as a whole does support the Board's findings that Mid-America's insistence that bargaining take place only in Tennessee, even to the exclusion of Paducah, Kentucky, the residence of Mid-America's bargaining agent, was unreasonable and was not advanced in good faith. Mr. Kirkpatrick himself is not always available at the Memphis office. When Union representatives telephoned him there, he was not in, and usually did not return their calls until the following day. The record does not disclose the location from which he did call. When the Board hearing was held in Memphis, Mr. Kirkpatrick did not testify.

While Mid-America contends that its agents denied access to Union patrolmen only on two occasions when the vessel was not in port, but at a lock and dam, the conditions imposed were unreasonable. The evidence showed that vessels like the Eleanor Gordon customarily operate twenty-four hours a day, and when they do come in for repairs, the crews

are not always aboard. In the past patrolmen had visited the Eleanor Gordon at any place in the river where boarding was possible.

We have considered all other arguments advanced on behalf of Mid-America but find them lacking in merit.

The chain of events shown supports the Board's conclusion that Mid-America was making no genuine effort to bargain in good faith. N. L. R. B. v. Hibbard Dowel Co., 7 Cir., 1960, 273 F.2d 565, 568.

Enforcement of the Board's Order is granted.

Enforcement granted.