LOUISIANA DOCK COMPANY, INC., and American Commercial Terminals, Inc., Petitioners/Cross–Respondents,

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent/Cross–Petitioner,

and

United Industrial Workers Union of the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO, Intervening Respondent.

UNITED INDUSTRIAL WORKERS UNION OF THE SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, ATLANTIC, GULF, LAKES AND INLAND WATERS DISTRICT, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 89–1593, 89–1968, 89–2065.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 26, 1990.

Decided Aug. 3, 1990.

---

Carol L. VanHal, Richard H. Schnadig, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., David W. Miller, Baker & Daniels, Indianapolis, Ind., Vance D. Miller, Lashly, Baer & Hamel, St. Louis, Mo., Andrew C. Partee, Jr., Partee & Evans, New Orleans, La., for Louisiana Dock Co., Inc.

Aileen A. Armstrong, Rosemary M. Collyer, GC, Howard E. Perlstein, Joseph H. Bornong, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., Irwin H. Cutler, Jr., Segal, Isenberg, Sales, Stewart & Cutler, Louisville, Ky., Louis L. Robein, Jr., Gardner, Robein & Urann, Metairie, La., Hugh F. Malone, N.L.R.B., New Orleans, La., James M. Altman, Robinson & Silverman, New York City, for N.L.R.B.

Irwin H. Cutler, Jr., David W. Hupp, Segal, Isenberg, Sales, Stewart & Cutler, Louisville, Ky., Louis L. Robein, Jr., William Luyre, Gardner, Robein & Urann, Metairie, La., for United Industrial Workers Union of the Seafarers Intern. Union of North America, Atlantic, Gulf, Lakes and Inland Waters Dist., AFL–CIO.

Before CUMMINGS and MANION, Circuit Judges, and GRANT, Senior District Judge.*

MANION, Circuit Judge.

This case arises out of unfair labor practice charges filed by the United Industrial Workers Union of the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO (the Union). The Union charged that American Commercial Terminals, Inc. (American) and Louisiana Dock Company, Inc. (LA Dock) violated § 8(a)(1), (3) and (5) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1), (3) and (5). The National Labor Relations Board's (the Board's) regional director issued a series of consolidated complaints which were tried before an ALJ in New Orleans, Louisiana. The ALJ issued a decision sustaining allegations that American and LA Dock (the Employers) had violated the Act by refusing to bargain with the Union. The Employers, the Union, and the General Counsel filed exceptions to the ALJ's decision. The Board sustained a number of the Employers' exceptions, dismissing the complaint entirely as to American and in substantial part as to LA Dock. The Employers timely filed a petition for review. The Union also filed a petition for review, and the Board filed a cross-application for enforcement. We grant the Employers' petition for review, and deny the Union's petition for review and the Board's cross-application for enforcement.

I. Background

LA Dock and American are owned by American Commercial Lines, Inc. (American Commercial). LA Dock provides services such as fleeting, cleaning, and repair to barges. American's only facility relevant to this case is a coal transfer facility at Louisville, Kentucky, which it acquired

* Hon. Robert A. Grant, Senior District Judge for the Northern District of Indiana, sitting by designation.

from LA Dock on January 1, 1979. This case turns on whether the parties treated the employees at five river facilities as constituting a single bargaining unit or multiple bargaining units during the course of their labor negotiations. The Board found that the facilities constituted multiple bargaining units, and we agree.

## A. Collective Bargaining History

LA Dock signed a collective bargaining agreement effective October 1, 1972, through October 1, 1975, recognizing the Union as the exclusive bargaining representative of

all laborers and maintenance workers engaged in jobs only with respect to [LA Dock's] barge cleaning operations adjacent to Marsh Island, Harrison County, Mississippi, and the fleeting and barge cleaning facilities used by [LA Dock] in Westwego and Harahan, Louisiana, on the Mississippi River.

By letter dated August 23, 1973, the parties extended the contract to cover employees "that are employed or will be employed in Cairo, Illinois." Other facilities were added later, and some were closed. From 1973 until 1980, the parties negotiated several agreements and addenda. Some of the agreements applied to all of the facilities, but most applied only to some of the locations. Employees at the various sites were treated differently with respect to wages, hours, and holidays. Only the facilities at Cairo, Hennepin (Illinois), Harahan, Westwego, and Louisville (Kentucky) are at issue in this case.

## B. The Union Demands A Single Multi-Location Unit

In July 1980, the Union wrote a letter to Robert Kilroy of American Commercial Barge Lines (who represented the Employers in labor negotiations) objecting to the Employers' suggestion that they negotiate a new agreement limited to Harahan. The Union for the first time expressed a desire to negotiate only for an agreement covering all locations.

On March 3, 1981, Kilroy wrote a letter to the Union reminding it that the collective bargaining agreement "for the various bargaining units expires on August 19, 1981." The parties agreed to meet on July 9 in New Orleans. On May 20, 1981, the Inland Rivermen's Association filed a petition seeking to represent employees at the Louisville coal transfer facility.

On July 9, the Union proposed a recognition clause referring to a single multi-location bargaining unit.

The company recognizes the Union as the sole collective bargaining agent for wages, hours, and conditions of employment for all employees at its Harahan and Westwego, Louisiana fleeting and repair facility, its Cairo, Illinois fleeting and repair facility, its Hennepin, Illinois barge cleaning and unloading facility, and at its coal transfer facilities and manhole cover product facilities located at American Commercial Terminals in Louisville, Kentucky, excluding guards and supervisors, as defined in the National Labor Relations Act. The employees included in the bargaining unit for which the Union is recognized and who are covered by this agreement, are sometimes referred to as "Employees."

Kilroy responded, stating the Employers had always treated the five locations as separate bargaining units. The Employers proposed two separate agreements, one covering Harahan and Westwego and one covering Cairo and Hennepin. The Employers refused to bargain at all over Louisville until the resolution of the pending representation petition.

On July 10, the Union stated it would not bargain unless the Employers agreed to recognize a single five-location bargaining unit. Kilroy restated the Employers' previous position. The parties repeated this procedure on August 19.

## C. LA Dock Implements Unilateral Changes

On August 20, LA Dock implemented changes in job classifications and granted a wage increase at Harahan, Westwego, Cairo, and Hennepin and added a holiday at Cairo and Hennepin. On September 1, LA Dock ceased making payments to the Un-

ion's welfare and pension plans and implemented its own health, welfare, and pension programs.

In April 1982, Kilroy requested that the Union meet and bargain over terms and conditions of employment for the Harahan, Westwego, Cairo, and Hennepin units. The Union declined. On July 27, Kilroy notified the Union that LA Dock intended to implement a wage increase for all employees at Cairo, Hennepin, Harahan, and Westwego effective August 1. The Union responded on August 11 that it viewed LA Dock's action as unlawful unilateral changes and that the proposed increases were inadequate.

## D. *Employee Layoffs At Harahan*

Stan Hopkins, manager of the Harahan shipyard, laid off twelve Harahan employees on June 28, and laid one more off on June 29. The Union complained about the lack of notice. On July 6, LA Dock, without notifying the Union, relieved two lead men of their duties and reduced their wages and overtime.

On July 30, Hopkins notified the Union he was laying off six more employees that day. The Union representative complained about the lack of notice, asked for a seniority list and the names of the laid off employees, and asked if employees had been allowed to bump into other classifications or onto a different shift. Hopkins replied that employees had no bumping rights. The Union filed grievances on August 4.

LA Dock reduced the status and compensation of five more leadmen on September 6 and one more on October 18. On September 14, LA Dock decided that more layoffs were necessary, and laid off two employees on September 16 and eight more on September 17. Hopkins notified the Union representative about these layoffs on September 16. In all, LA Dock reduced the status and compensation of eight leadmen on three occasions between July 6 and October 18 and laid off 56 employees on 14 different occasions between June 28 and October 19.

## E. *Proceedings Below*

The Board, in agreement with the ALJ, found that LA Dock violated § 8(a)(5) and (1) of the Act between June and October 1982 by failing to bargain with the Union over the effects of layoffs and over reductions in the number of employees performing leadman duties. However, the Board reversed the ALJ's findings that the Employers had violated the Act by making unilateral changes in wages, hours, and other conditions of employment without having bargained in good faith with the Union.

To remedy the violations, the Board ordered LA Dock to cease and desist from the unfair labor practices and from interfering with employees' rights under § 7 of the Act, 29 U.S.C. § 157. The Board ordered LA Dock to bargain with the Union concerning the effects of its decision to lay off employees and concerning the reduction in the number of employees performing leadman duties. In addition, the Board ordered LA Dock to make whole any employees adversely affected by the layoff decisions and by the decision to reduce the number of employees performing leadman duties.

## II. Change In Wages, Hours, and Other Terms and Conditions of Employment

The General Counsel[1] alleged the Employers violated § 8(a)(5) and (1) of the Act by unilaterally implementing changes in the terms and conditions of employment at their various facilities without first bargaining in good faith with the Union. That violation is premised on the further allegation that the Employers' fleeting, barge cleaning, repair, and coal transfer facilities at Harahan, Westwego, Cairo, Hennepin, and Louisville constitute a single appropriate bargaining unit, and that the Employ-

---

1. The General Counsel prosecuted the original complaint before the Board, succeeding only partially. The General Counsel appears in this court in a new posture—that of defending the Board's findings, some of which are adverse to his original position. See 29 U.S.C. § 153(d) (defining the General Counsel's duties).

ers unlawfully insisted upon bargaining in a less comprehensive unit.

The Board dismissed the complaint (reversing the ALJ, who had sustained the allegations against the Employers), finding that the General Counsel failed to prove the existence of a single multi-location unit. Accordingly, the Board found that the Union demanded bargaining in a unit other than the established bargaining unit, a demand which the Employers were free to reject. The Board further found that the Union conditioned its participation in bargaining on the Employers' recognition of the non-operating multi-location unit, and that the Employers therefore were free to implement their proposals.

■ The General Counsel bears the burden of proving unfair labor practice allegations by a preponderance of the evidence. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983). The Board's findings of fact are conclusive if supported by substantial evidence. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The ultimate determination that the General Counsel has not met his burden of proof "must be upheld unless the determination has no rational basis in the record." *Kankakee–Iroquois County Employers' Ass'n v. NLRB*, 825 F.2d 1091, 1093 (7th Cir.1987) (quoting *Allbritton Communications Co. v. NLRB*, 766 F.2d 812, 817 (3d Cir.1984), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 850, 88 L.Ed.2d 891 (1986)).

■ Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5), provides: "It shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees...." Section 8(b)(3), 29 U.S.C. § 158(b)(3), assigns labor organizations a reciprocal duty to bargain collectively. In *NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), the Supreme Court held "an employer's unilateral change in conditions of employment under negotiation is ... a violation of § 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the ob-

jectives of § 8(a)(5) much as does a flat refusal." *Id.* at 743, 82 S.Ct. at 1111. Thus a company has a duty to refrain from making unilateral changes in employment conditions subject to mandatory bargaining (even after the termination of an existing contract), which derives from the employer's statutory duty to bargain collectively. *NLRB v. SAC Construction Co.*, 603 F.2d 1155, 1156–57 (5th Cir.1979).

■ However, the Employers in this case contend they were released from their duty to bargain (and therefore from their derivative duty to refrain from unilateral changes) by virtue of the Union's demand that all negotiations be conditioned on the acceptance of a single multi-location bargaining unit. "Although permissive subjects are appropriate topics for negotiation between the union and the employer, an employer or a union commits an unfair labor practice by conditioning the consummation of a collective bargaining agreement upon the inclusion of a term covering a permissive subject of bargaining." *The Idaho Statesman v. NLRB*, 836 F.2d 1396, 1400 (D.C.Cir.1988). Wages, hours, and other terms and conditions of employment are mandatory subjects of bargaining, whereas the scope of the bargaining unit is a permissive subject. 29 U.S.C. § 158(d); *The Idaho Statesman*, 836 F.2d at 1400. Therefore, "[i]f one party conditions all bargaining upon an acceptance of an enlarged bargaining unit, effective and lawful negotiations are blocked and the innocent party need not negotiate as long as the bargaining is forestalled by the illegal demand." *General Drivers and Helpers Union, Local No. 554 v. Young and Hay Transportation Co.*, 522 F.2d 562, 566 (8th Cir.1975). If the Union in this case conditioned all negotiations on a change in the scope of the bargaining unit, the Employers were released from their duty to negotiate mandatory bargaining subjects, and consequently were released from their derivative duty to refrain from implementing unilateral changes with respect to those subjects. In other words, if the Union unlawfully conditioned future bargaining, the Employers were free to implement uni-

lateral changes with respect to *any* mandatory bargaining subjects.

The negotiations between the parties broke off August 19, 1981, when the Union conditioned further bargaining on the Employers' recognition of a single multi-location bargaining unit. The Employers likewise refused to bargain except in recognition of three or more geographically distinct units. Thereafter LA Dock made the changes in terms and conditions of employment at its Harahan, Westwego, Cairo, and Hennepin facilities. Thus, the lawfulness of the Employers' *unilateral changes turns* on whether the Board reasonably concluded that the General Counsel failed to prove the existence of a single multi-location unit, and that the Union's insistence on such a unit foreclosed effective negotiations.[2]

■■■■ The record supports the Board's finding that the parties never intended to bargain in a single multi-location unit, but historically recognized the autonomy of each company location and at relevant times recognized units of American and LA Dock employees. First, we note that no contract provision clearly expresses an agreement to bargain in a single, multi-location unit. Each recognition clause negotiated by the parties contained a list of locations at which the Employers recognized the Union, but contained no reference to the bargaining *unit or units in which* they were grouped. Clauses referred to prospective facilities (such as at Louisville) that did not yet exist (and thus had no employees yet in need of representation) and that were therefore precluded from being considered part of a single unit until employee sentiment at those locations could be measured. See *Kroger Co.*, 219 NLRB 388, 389 (1975).

Second, the labor negotiation history supports the finding of separate units. Three separate addenda set out terms and conditions for the five relevant facilities (one for Harahan and Westwego, one for Cairo and Hennepin, and one for Louisville). The addenda recognized different job classifications at each location. Wages, holidays, seniority rights, training programs, and other terms and conditions varied among the different locations. Even the master agreement did not apply uniformly at all locations—Harahan had a different grievance procedure, and Cairo had different overtime provisions. No agreement provided for transfer of employees between locations. The parties met at different times and places to negotiate over the different locations. The Union sent different negotiating teams to the bargaining sessions depending on which location was at issue. The Union never objected until the current dispute when the Employers referred to separate units in correspondence.

Third, Louisville was clearly a distinct unit at the time negotiations broke down. When American took over Louisville, it was not bound to join LA Dock in a single bargaining unit unless it was a single employer with, or the alter ego of, LA Dock, or it agreed to become part of a multi-employer bargaining unit. However, the General Counsel did not attempt to prove that LA Dock and American were a single employer or alter egos. The Board reasonably concluded that the five locations were not a single bargaining unit as of 1981, when negotiations broke down.

### III. Failure To Give The Union Reasonable Notice Of Layoffs

■■■■ Although the Board held the Union's demand of an expanded bargaining unit released the Employers from their duty to negotiate wages, hours, and other conditions of employment, it did not release LA Dock from its duty to negotiate layoffs and reductions in leadmen. The Board argues the Union's unlawful conduct only releases LA Dock from negotiating those

2. Once a bargaining unit has been established, "the statutory interest in maintaining stability and certainty in bargaining obligations requires adherence to that unit in bargaining." *Shell Oil Co.*, 194 NLRB 988, 995 (1972), *pet'n for review denied sub nom., Oil, Chemical and Atomic Workers v. NLRB*, 486 F.2d 1266 (D.C.Cir.1973).

"Thus, it is well established that the integrity of a bargaining unit cannot be unilaterally attacked, and that ... it may be changed only by mutual agreement of the parties or by Board action." *Arizona Electric Power Coop.*, 250 NLRB 1132, 1133 (1980) (footnotes omitted).

issues dependent upon the scope of the bargaining unit. Since the layoffs only occurred at Harahan, the Board contends, the Union's stand on layoffs is unaffected by the acceptance or rejection of a single multi-location unit, and therefore LA Dock should not be released from its duty on this point. However, when the Union conditioned further bargaining on the acceptance of an enlarged bargaining unit, there is no evidence in the record it excepted bargaining on the issue of layoffs from this condition. The Union simply demanded a single multi-location bargaining unit, and refused to negotiate until LA Dock capitulated. As we have noted, the scope of the bargaining unit is a permissive, not mandatory, bargaining subject. *The Idaho Statesman, supra*, 836 F.2d at 1400. A party cannot "refuse to enter into agreements on the ground that they do not include some proposal which is not a mandatory subject of bargaining.... [S]uch conduct is, in substance, a refusal to bargain about the subjects that are within the scope of mandatory bargaining." *NLRB v. Wooster Division of Borg–Warner Corp.*, 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958); see also *Airline Pilots Association v. United Air Lines*, 802 F.2d 886, 902 (7th Cir.1986). Layoffs are within the scope of mandatory bargaining. *NLRB v. Advertisers Manufacturing Co.*, 823 F.2d 1086, 1090 (7th Cir.1987). Therefore the Union, by conditioning all bargaining on the inclusion of a permissive subject, released LA Dock from its duty to negotiate layoffs.

■ The Board further argues that the parties reached impasse on the bargaining unit issue, but nevertheless had a duty to negotiate on other non-deadlocked issues. "'Impasse' signifies that the parties have been unable to come to terms, after honestly trying to do so." *National Metalcrafters, Division of Keystone Consolidated Industries v. McNeil*, 784 F.2d 817, 827 (7th Cir.1986). "In essence, an impasse occurs when the parties are deadlocked....

The NLRB may determine that an impasse exists '[w]here good faith bargaining has not resolved a key issue and where there are no definite plans for further efforts to break the deadlock.'" *Richmond Recording Corp. v. NLRB*, 836 F.2d 289, 293 (7th Cir.1987) (quoting *Dallas General Drivers v. NLRB*, 355 F.2d 842, 845 (D.C.Cir.1966)). "[W]hen impasse occurs, the employer is free to implement changes in employment terms unilaterally so long as the changes have been previously offered to the union during bargaining." *Huck Manufacturing Co. v. NLRB*, 693 F.2d 1176, 1186 (5th Cir.1982). The Board contends the parties did not even discuss layoffs before the alleged "impasse" occurred; therefore the "changes" (layoffs) had not been "previously offered to the union during bargaining," and thus could not be unilaterally implemented by LA Dock.

However, in this case the parties did not reach an impasse, because the Union did not bargain in good faith. The Union's demand that all future negotiations be conditioned upon the Employers' acceptance of a single multi-location bargaining unit violated the Union's duty to negotiate in good faith under § 8(d) of the Act. *Associated General Contractors v. NLRB*, 637 F.2d 556, 559 (8th Cir.1980); *Oil, Chemical and Atomic Workers, Int'l Union, AFL–CIO v. NLRB*, 486 F.2d 1266, 1270 (D.C.Cir.1973). Since there were no good faith negotiations, the parties could not reach an impasse. Thus, *Huck Manufacturing*, which applies to parties that reach a good faith impasse, is inapplicable. LA Dock is released from its duty to negotiate not by a good faith deadlock, but rather by the Union's unlawful conduct. "If one party [the Union] conditions all bargaining upon an acceptance of an enlarged bargaining unit, effective and lawful negotiations are blocked and the innocent party need not negotiate as long as the bargaining is forestalled by the illegal demand." *Young & Hay, supra*, 522 F.2d at 566.[3]

**3.** Contrary to the Employers' assertions, this does not conflict with the Board's prior decision in *River City Mechanical*, 289 NLRB No. 170, slip op. at 9 n. 8 (1988), where the Board found

the employer violated the Act only after first finding a good faith impasse. There was no good faith impasse in this case; therefore *River City Mechanical* is distinguishable.

We reverse the Board's order to the extent it found the layoffs violated the Act. Because we so hold, there is no need to address whether the Board acted within its remedial discretion in ordering LA Dock to bargain with the Union and to provide back pay to remedy its failure to bargain over the effects of the layoffs. Since the layoffs were not illegal, these remedies are vacated.

The Employers' petition for review is granted. The Union's petition for review is denied. The Board's cross-application for enforcement is denied.